Tecktonius vs. Scott.

TECKTONIUS, Appellant, vs. SCOTT, Respondent.
SAME, Respondent, vs. SAME, Appellant.

*April 15 — May 21, 1901.*

*Public policy: Agreement not to manufacture: Patents: Equivalents: Construction of adjudication of United States court: Right to manufacture equivalent: Contracts.*

1. A provision in a contract, unlimited as to time, space, and extent of trade, by which one party binds himself and his heirs not to manufacture or sell any band-fastening device of any kind or character, except that covered by a certain patent, is unreasonable and void as against public policy.

2. Where a valid patent has been obtained, any improvement which performs the same functions by equivalent means is an infringement.
3. Where an investigation of a state of the art shows that a given patented invention is of a primary character, and the patentee is a pioneer in the field, a larger latitude is given to the doctrine of equivalents than if the art has been well explored, and a change of form or combination only is involved.
4. Where a person has a right under a contract to manufacture a patented device, he also has the right to manufacture its legal equivalent.
5. A judgment of a United States court adjudging that a band fastener manufactured by T. was an infringement of a patent belonging to S., in view of the opinion filed, is *held* to adjudge that T.'s device was an equivalent of that manufactured under S.'s patent. CASSODAY, C. J., and DODGE, J., dissent.
6. Where, after judgment in such case, S. sells his patent to T., but reserves the right to manufacture his invention, the manufacture by S. of the band fastener formerly manufactured by T. is not a violation of the contract. CASSODAY, C. J., and DODGE, J., dissent.

APPEALS from a judgment of the circuit court for Racine county: FRANK M. FISH, Circuit Judge. *Affirmed on plaintiff's appeal; reversed on that of defendant.*

This is an action in equity to declare forfeited a certain contract, and to perpetually enjoin the defendant from exercising any right or privilege thereunder. The contract in question was one whereby the plaintiff granted to the defendant the right to manufacture a patented appliance called a band fastener, which is a metal device for securing the ends of bands or hoops on wooden tanks, and tightening the same when desired.

The action was tried by the court. The evidence showed that October 16, 1888, the defendant, *Scott*, secured letters patent upon certain improvements in band fasteners; the same consisting of a pair of hollow metal castings or heads, with stationary crossbars therein, and with metallic grips loosely mounted therein, and a rod extending through one head and grip into and through the opposite head and grip; said rod having screw-threaded ends, with nuts thereon, so

that the ends of the bands, when inserted in each head, were gripped by bending or belaying the same over and under the crossbars of the head, and then the band could be tightened by screwing up the nuts upon the end of the rod. After procuring his patent, the defendant proceeded to manufacture the appliance at Racine, and built up a business therein, and the same was known to the trade as the "Scott lug." On March 20, 1894, the plaintiff obtained letters patent for certain improvements in band fasteners, whose general shape was quite similar to the defendant's appliance, and which consisted of a pair of hollow metallic tapering castings or heads, with flat base plates, but no crossbars, into which the ends of the bands were to be inserted and held in place by clamping wedges inserted into the tapering apertures of the heads; said wedges having transverse corrugations on the bottom surface, and being provided with a screw-thread bolt, with nuts, passing through the heads and wedges. After receiving his patent, the plaintiff proceeded to manufacture a lug called the "Tecktonius lug," claiming the same to be the same appliance covered by his patent of 1894. The lug or fastener so manufactured by the plaintiff, however, differed from the device described in his claim for the patent, in that the base plate was partly cut away, and one of the parts of such plate which was left was made with a rounding surface, by means whereof the band, after being introduced into the head, was bent or belayed in a somewhat similar fashion to the method described in the *Scott* patent. In 1899 the defendant, *Scott*, brought suit against the plaintiff in the United States circuit court for the Eastern district of Wisconsin, claiming that the device so manufactured by *Tecktonius* was an infringement upon his (*Scott's*) patent. This action was tried in due course, and resulted in a judgment holding that *Scott's* patent was valid, and that *Tecktonius* had infringed upon it by making and selling the device manufactured by him, called the "Tecktonius lug," and

granting a perpetual injunction against such manufacture. Upon pronouncing judgment, Judge SEAMAN, before whom the case was tried, rendered the following opinion:

"The defendant by his answer denies both infringement and the validity of the patent, and sets up prior patents and uses, by way of anticipation, and as showing the prior state of the art, as well. Infringement is the only issue which requires serious consideration, on the view I take of the undisputed testimony, and the inquiry as to infringement depends wholly upon the rule of construction which is applicable to the claims of this patent. The contention on the part of the defendant calls for a narrow rule, which would, in effect, limit infringement to the precise construction shown in the drawings and specifications, founding such views upon the terms of reference and limitation found in the claims, and upon the alleged slight advance over the prior art in the invention. If such is the rule which must be applied, it is manifest that the variations in the defendant's device are sufficient to avoid infringement.

"That there is patentable invention in the device described is not fairly disputable, upon the record. It is true that the elements which enter into the combination are not new, when separately considered, and that the use of a pair of lugs, of a threaded tie bolt arranged for tightening the band, and of other components of the device, were not novel in their application, in one form or another, to adjusting and fastening hoops or bands. But the novelty and merit of the combination clearly appear both in the ready adjustment by which the band can be applied, without requiring accurate measurement and preparation at the shops, and by which it is fastened by the mechanism of the lugs, without rivets or other means tending to weaken the band. Neither of these important results was accomplished or fairly approached in the prior art, and the accomplishment of both results by the means devised was a distinct advance in the art; and, unless this meritorious character of the invention is lost through terms of restriction in the claims of the patent, the invention is entitled to recognition for fair, if not liberal, construction. *Bundy Mfg. Co. v. Detroit Time-Register Co.* (C. C. A. 6th Circuit), 94 Fed. Rep. 524.

"In making the application for patent, the device and its purpose were well described, but the claims of invention

were not stated with desirable clearness and breadth. No limitation was imposed by action in the patent office, and I am satisfied, under the circumstances shown, that the set phrases of reference to the specifications must be held of such force as to limit the grant to the precise construction of each element as described, thus destroying any value in the patent, but am of opinion that a plain equivalent performing the same function in the combination is covered by the patent. So construed, it is clear that the defendant's device is a mere colorable deviation. Much stress is placed upon an asserted difference in principle,— that one holds the band ends by a ' bending grip,' while the other provides a 'friction wedge.' It appears to me sufficient that the ' bending grip ' is produced by each, and necessarily so, from the form in which the head is made and used in each, the difference being in degree only.

"The patents issued to the defendant, and appearing in the record, are not referred to in the argument on behalf of the defendant, and I do not regard them as material.

"Decree will enter in accordance with the prayer of the bill."

*Tecktonius* appealed from this judgment, but said appeal was never brought to a hearing, because while the same was pending the parties settled the litigation and all matters in controversy, and *Tecktonius* paid *Scott* $3,000, and *Scott* made a deed of assignment of his patent to *Tecktonius*, and an agreement was made between the parties August 2, 1899, which, after reciting the issuance of the *Scott* patent, and the fact that *Tecktonius* had become the owner thereof, and *Scott* was desirous of acquiring a shop right therein, proceeded as follows:

"Now, THIS INDENTURE WITNESSETH: that, for a valuable consideration to him in hand paid, the receipt whereof is hereby acknowledged, the undersigned, *Emil C. Tecktonius*, has assigned, sold, and set over, and by these presents does assign, sell, and set over, unto the said *John M. Scott*, the right, permission, and authority to manufacture and sell from a single shop, to be located at the city of Racine, Wisconsin, the invention described in said letters patent above referred to; such right to be personal to the said grantee

and his heirs, and to be otherwise nonassignable; provided, however, that nothing in this assignment and agreement shall be deemed to prevent the grantee from having such invention manufactured wherever the same may be done to his best advantage, and that, in the event that he shall remove from the city of Racine, the right hereby assigned shall follow his place of residence, and accrue to him and to his heirs for the life of said patent.

" And, in consideration of the grant hereinbefore set forth, said *John M. Scott* doth bind himself and his heirs to establish and always maintain a list and schedule of prices for band fasteners manufactured and sold by him under this license, at the rates, schedules, and discounts furnished to him on this day and on the 1st days of November, February, May, and August of each year during the life of this agreement; such rates and schedules to be based upon and to be the same as the rates and schedules established and used by the said *Emil C. Tecktonius*, grantor, in the conduct of his own business in the sale of said invention; said prices to be reasonable and profitable.

" And, furthermore, in consideration of its conveyance, the said *John M. Scott* promises and agrees to and with the said *Emil C. Tecktonius* that he will not, during the life of this agreement, enter into or engage in the manufacture of any band-fastening device of any kind or character whatsoever, other than that covered by the field of invention referred to and described in the letters patent hereinbefore referred to:

" Provided, however, that nothing herein contained shall affect the right of the said *John M. Scott* to manufacture and sell what are known as 'round iron lugs,' or to sell such lugs as he has heretofore manufactured and are now on hand.

" And it is further agreed, as liquidated damages between the parties to this agreement, that if the said *John M. Scott* shall at any time be guilty of a breach of this contract and agreement, or of any of its conditions, and fail to well and truly keep and perform all of the conditions herein contained on his part to be kept and performed, that he shall thereupon and thereby forfeit all of his right, title, and interest in and to the shop right hereby conveyed; and on the part of said *Emil C. Tecktonius* it is agreed that, if he shall fail to well and truly keep and perform the terms and con-

ditions of this agreement on his part to be kept and per-
formed, that he shall forfeit to the said *John M. Scott* thereby
the sum of five hundred ($500) dollars in cash."

At the time this agreement was made, *Scott* was manu-
facturing and selling at Racine a device known as the "Scott
lug," in accordance with the claims of the *Scott* patent of
1888; and he continued so to do until December, 1899, when
he commenced to manufacture and sell a band fastener iden-
tical in shape and construction with the lug manufactured
by *Tecktonius* prior to the infringement action, and which
was adjudged to be an infringement on the *Scott* patent;
making the same with the words: "*J. M. Scott*, Racine, Wis.
Patd. Oct. 16, 1888." Thereupon *Tecktonius* commenced
this action, claiming that *Scott* had no right to manufacture
such lug, and mark the same with his name; that he had
forfeited his rights under the said contract by so doing, and
was committing a fraud upon the plaintiff's rights by mark-
ing said lug with his own name, and was destroying the
plaintiff's established business,— and prayed a forfeiture of
all *Scott's* rights under said contract, and a perpetual in-
junction to prevent him from exercising any of such rights
in the future. Upon these facts the court held that the con-
tract provision whereby *Scott* agreed that he would not man-
ufacture any band fastener other than that covered by the
field of invention described in the patent of 1888 was con-
trary to public policy and void, and held, also, that defend-
ant, *Scott*, had no right, under the agreement in question, to
manufacture the so-called "Tecktonius lug," or to mark the
same with his own name, and that the plaintiff was entitled
to judgment enjoining the defendant from representing to
the trade that he had such right, or that he had a right to
mark such lug with his own name. Judgment being en-
tered in accordance with these findings, the plaintiff ap-
pealed from that part of the judgment which holds that
*Scott's* agreement not to manufacture any other band fas-

Tecktonius vs. Scott.

tener is void, as against public policy, and the defendant appealed from the remainder of the judgment.

For the plaintiff there were briefs by *Kearney & Thompson*, attorneys, and *H. G. Underwood*, of counsel, and oral argument by *Mr. Underwood* and *Mr. T. M. Kearney*. They contended, *inter alia*, that the contract was not void as against public policy. *Oregon S. N. Co. v. Winsor*, 20 Wall. 64–67; *Alger v. Thacher*, 19 Pick. 51; *Jones v. Lees*, 1 H. & N. 189; *Billings v. Ames*, 32 Mo. 265; *Vickery v. Welch*, 19 Pick. 523; *Leather C. Co. v. Lorsont*, L. R. 9 Eq. 345; Greenhood, Public Policy, 696; *Jarvis v. Peck*, 10 Paige, 118; *Alcock v. Gilberton*, 5 Duer, 76; *Nordenfelt v. Maxim-Nordenfelt G. & A. Co.* [1894] App. Cas. 535–575; *S. C.* 6 Eng. Rul. Cas. 413. Defendant should not be permitted to affirm the contract and at the same time question its binding force and validity. *Hunt v. Turner*, 9 Tex. 385; *S. C.* 60 Am. Dec. 167; *Manchester & L. R. Co. v. Concord R. Co.* 9 L. R. A. 689; *National W. P. Co. v. Hobbs*, 90 Hun, 288; *Flint v. Johnson*, 59 Vt. 190. The contract cannot be properly construed as unlimited in point of time or as to the territory to which it applies. *Curtis v. Gokey*, 68 N. Y. 300; *Hubbard v. Miller*, 27 Mich. 15; *Dethlefs v. Tamsen*, 7 Daly, 354; *Boardman v. Wheeler*, 27 Hun, 616; *Heichew v. Hamilton*, 3 G. Greene, 596. The defendant secured no right under the contract to make the "Tecktonius lug." *Woodworth v. Rogers*, 3 Woodb. & M. 135; *Pitts v. Wemple*, 6 McLean, 558; *Whipple v. Baldwin Mfg. Co.* 4 Fish. Pat. Cas. 29; *Blake v. Robertson*, 94 U. S. 728; *Star S. C. Co. v. Crossman*, 4 Cliff. 568; *Bachelder v. Moulton*, 11 Blachf. 304; *Hartz v. Cleveland B. Co.* 95 Fed. Rep. 681; *Nilson v. Morse*, 52 Wis. 240, 253; *Sigerson v. Cushing*, 14 Wis. 527; *Flint v. Johnson*, 59 Vt. 190; *Montpelier & W. R. R. Co. v. Langdon*, 45 Vt. 137; *Hicks v. Cram*, 17 Vt. 455.

For the defendant there was a brief by *Winkler, Flanders, Smith, Bottum & Vilas*, and oral argument by *F. H. Remington* and *E. H. Bottum*.

WINSLOW, J.   1.  We entirely agree with that part of the judgment of the trial court which holds that the contract provision by which *Scott* agreed that he would not, during the life of the agreement, engage in the manufacture of any band-fastening device other than that covered by the field of invention described in the *Scott* patent is void, as against public policy.   It is well settled that such contracts are void unless limited, as to time, space, and extent of trade, to what is reasonable under the circumstances of the case, because they tend to deprive the public of the services of persons in those capacities in which they are most useful, and also tend to expose the public to the evils of monopoly. *Richards v. Am. D. & S. Co.* 87 Wis. 503.   The restriction in the present case is an unlimited one as to space, and covers all states and countries.   *Berlin M. Works v. Perry*, 71 Wis. 495.   Even in cases where an established business is sold, and the vendor agrees not to engage in such business in the future, such agreement is only valid if confined to such limited time, and *within such limited territory*, as is reasonably necessary to protect the purchaser in the full enjoyment of the benefits of his purchase.   *Palmer v. Toms*, 96 Wis. 367.   In no view that we have been able to take of the case does the agreement before us, being unlimited as to territory, seem to be reasonable.   *Gamewell F. A. T. Co. v. Crane*, 160 Mass. 50; *S. C.* 22 L. R. A. 673.

2.  We are unable, however, to agree with the conclusion of the trial court to the effect that *Scott* violated his agreement or invaded any right of *Tecktonius*, by manufacturing the band fastener which forms the subject of this action. *Scott* sold his patent of 1888 to *Tecktonius*, but took back a contract giving him a right to manufacture and sell the invention described in it from a single shop in Racine.   He then proceeded to manufacture a band fastener identical in shape, construction, and principle with the band fastener which *Tecktonius* had previously manufactured, and which

had been the subject of the previous litigation in the United States court.  The result of this litigation is, of course, binding and conclusive upon both parties.  In that litigation it was decided that the band fastener in question, which was then being made by *Tecktonius*, was an infringement upon *Scott's* patent.  This might be so held without necessarily determining that *Scott* could manufacture it under his patent.  Thus, if the *Scott* patent simply covered the grip feature, and the *Tecktonius* device embodied this in combination with some other new and patentable feature, it might, perhaps, be that a simple judgment of infringement should be construed as deciding only that *Tecktonius* infringed by incorporating the "grip" feature, and that hence the judgment was not a decision that *Scott* could manufacture the *Tecktonius* device under his patent.  But the judgment must be construed in the light of the written opinion of the judge.

It is a well-settled principle of patent law that, where a valid patent has been obtained, any improved machine which performs the same functions by equivalent means is an infringement.  Hall, Patent Infringement, §§ 162–186.  Also, that where an investigation of the state of the art shows that a given patented invention is of a primary character, and the patentee is a pioneer in the field, a larger latitude is given to the doctrine of equivalents than if the art has been well explored, and a change of form or combination only is involved.  Id. §§ 155, 156, 199, 201.

While, as an original proposition, it must be doubted whether the *Tecktonius* device was an equivalent of the device named in the *Scott* patent, still, if Judge SEAMAN so decided, it is conclusive on the parties here.  Did he so decide ?

Perusal of the opinion shows that he first considered the state of the art, and concluded that *Scott* was a pioneer in the art; that his invention was a distinct advance, entitled to fair, if not liberal, construction.  Having so held, he

further held that, though the claims of the patent were not stated with clearness and breadth, still that " a plain *equivalent*, performing the same function in the combination, is covered by the patent. So construed, it is clear that the *defendant's device* is a mere colorable deviation." Here he evidently referred to the whole *Tecktonius* device. He calls it a "mere colorable deviation," which is a smaller and more restricted term than *an equivalent;* the term equivalent being evidently used by him in its technical patent law sense. It seems certain that he held the *Tecktonius* device to be an equivalent. This construction of Judge SEAMAN's judgment really ends the case upon this branch. The defendant, *Scott,* has an unquestioned right, under his contract, to manufacture the device that was covered and described by the patent of 1888; and, if he has the right to manufacture that device, he has the right to manufacture its legal equivalent, because that, also, is covered by the patent.

*By the Court.*— That part of the judgment appealed from by the plaintiff is affirmed, and that part of the judgment appealed from by the defendant is reversed, with costs, and the action is remanded with directions to render judgment for the defendant in accordance with this opinion.

CASSODAY, C. J. By dissenting in this case, I do not wish to have it understood that I claim that the decree of the federal court is not binding on this court. On the contrary, I have no doubt but that that decree, as to the questions covered by it, is conclusive upon the parties to this action. In fact, I so suggested on the argument, and have no reason to change my mind. But, in my judgment, that decree does not cover the question involved in this action. That action was commenced by *Mr. Scott* in the federal court January 28, 1898. It was an ordinary bill in equity to restrain *Tecktonius* from manufacturing and selling the "Tecktonius lug," so called, on the ground that it was an

infringement of the patent issued to *Scott* October 16, 1888, and numbered 391,340. *Tecktonius* answered by way of denying such infringement, and also by way of alleging that such patent so issued to *Scott* was invalid on the ground that he was not the original and first inventor of the device therein described, but that the same was covered by one or more of the prior patents therein alleged. The issues so joined were tried in the federal court, and an interlocutory decree entered therein July 24, 1899, wherein it was adjudged, in effect, that the patent so issued to *Scott* October 16, 1888, was valid; that the manufacture and sale of the "Tecktonius lug" by *Tecktonius* was an infringement of that patent; that *Scott* was entitled to recover the gains and profits which *Tecktonius* had made or received by reason of such infringement; and the cause was referred to ascertain the amount, and *Tecktonius* enjoined from further infringing such patent. In making such decree, the learned judge of the Eastern district expressly stated, in effect, that such infringement was the only issue which required serious consideration; that by a narrow construction of the *Scott* patent there would be no infringement, but that by a broad construction of that patent, as he felt bound to give it, there was an infringement. The validity of the patent issued to *Tecktonius* March 20, 1894 (being No. 516,690), was not involved in that litigation. True, the answer of *Tecktonius* in that action alleged "that all band fasteners made and sold by him were constructed under letters patent of the United States, and lawfully granted to him," but that was alleged solely by way of defense against the charge of infringement. In other words, there was no cross bill to determine the validity of the patent so issued to *Tecktonius*. The "Tecktonius lug" being an infringement of the *Scott* patent, as held by the federal court, the fact that *Tecktonius* obtained a patent on such lug nearly six years after the patent was so issued to *Scott* was no defense to the charge

of such infringement, even though it was a valid patent. Accordingly, Judge SEAMAN stated in his opinion that "the patents issued to the defendant [*Tecktonius*], and appearing in the record, are not referred to in the argument on behalf of the defendant [*Tecktonius*], and *I do not regard them as material.*" Thus it appears that the decree was made in the infringement suit without regard to the question whether the patent so issued to *Tecktonius* March 20, 1894, was valid or invalid. In other words, the federal court did not pass upon, nor attempt to pass upon, the validity of that patent. Such validity was not involved in that action, and, of course, could not legitimately be determined in that action. After the entry of that decree, and after *Tecktonius* had appealed therefrom, and on August 2, 1899, the parties settled the litigation and all matters in controversy between them. In such settlement *Scott* sold and assigned his patent to *Teck-tonius*, and the latter paid him therefor $3,000, and gave back to him a shop right of what was so covered by the patent so issued to *Scott* October 16, 1888, as appears in the agreement copied into the opinion filed by my brother WIN-SLOW. That agreement, as I understand, is construed by all the members of this court as only covering such shop right as *Scott* previously held under his patent. In other words, by that agreement *Tecktonius* parted with no property or rights of property which he. possessed, if any, under his patent prior to his purchase of the *Scott* patent, and *Scott* obtained no property or property rights thereby which were not covered by his patent so assigned to *Tecktonius*. *Scott* thereupon continued to manufacture and sell the device described in the patent so issued to him October 16, 1888, until in December, 1899, and then, for the first time, commenced to manufacture and sell the device described in the patent so issued to *Tecktonius* March 20, 1894. January 5, 1900, *Tecktonius* commenced this action to restrain *Scott* from such manufacture and sale of the device so described

in his patent, on the ground that he had no right to the same under such agreement, and also to cancel and set aside so much of that agreement as secured to *Scott* such shop right. The question recurs whether the patent so issued to *Tecktonius* is a valid, subsisting patent; and, if so, then were the property and rights of property thereby acquired by *Tecktonius* determined and extinguished by the decree in the federal court? As indicated, the validity of the patent so issued to *Tecktonius* was not involved in or questioned in the infringement suit, otherwise than that the device therein described was held to be an infringement of the *Scott* patent; nor is it otherwise questioned in this action. The granting of "a patent is *prima facie* evidence that the patentee was the first inventor, and casts upon him who denies it the burden of sustaining his denial by proof." *Smith v. Goodyear D. V. Co.* 93 U. S. 486; *Lehnbeuter v. Holthaus,* 105 U. S. 94; *Morgan v. Daniels,* 153 U. S. 120, 123. The fact that, a short time after making the agreement mentioned, *Scott* commenced the manufacture and sale of the device described in the patent so issued to *Tecktonius,* is evidence to be considered in determining the validity of that patent. *Smith v. Goodyear D. V. Co.* 93 U. S. 495, 496; *McGowan v. N. Y. B. & P. Co.* 141 U. S. 332, 343; *Barbed Wire Patent,* 143 U. S. 285.

"Two machines or devices are substantially identical when they perform substantially the same thing in substantially the same way to obtain the same result; and they differ from each other, in the sense of the patent law, when they perform different functions, or in a different way, or produce substantially different results." *Cantrell v. Wallick,* 117 U. S. 689.

In that case it was also held that:

"Two patents may be valid when the second invention is an improvement on the first, and, if the second includes the first, neither patentee can lawfully use the invention of the other without his consent; but a stranger sued for infringing the second patent cannot defend by setting up the existence of the first patent."

So it has been held that:

"The inventor of an improvement has a right to his own improvement. The original inventor cannot use the improvement because it is ingrafted upon his invention." *Whipple v. Baldwin Mfg. Co.* 4 Fish. Pat. Cas. 29.

That the "Tecktonius lug" was a patentable device, notwithstanding the prior patent so issued to *Scott*, is manifest, in the broad difference in the claims of the respective patents; for it is a well-established rule of patent law that, "where a specific device or combination is claimed, the nonclaim of other devices or combinations apparent on the face of the specification is, in law, so far as the patentee is concerned, a dedication of them to the public, and will so be enforced, unless he with all due diligence surrenders his patent for reissue, and proves that his omission to claim them arose wholly from inadvertence, accident, or mistake." *Miller v. Brass Co.* 104 U. S. 350; *Mahn v. Harwood*, 112 U. S. 354, 362, 363.

The claims for the *Scott* patent are:

"Having thus described my invention, what I claim as new, and desire to secure by letters patent, is: (1) The herein described *clamp* for uniting the ends of hoops or bands, or tightening the same, consisting of a pair of heads recessed and apertured as set forth, and provided with crossbars, grips loosely mounted therein, and a rod extending through one head into and through the opposite head, having screw-threaded ends, with nuts thereon, substantially as described. (2) The herein described *clamp* for uniting the ends of hoops or bands, or tightening the same, consisting of a pair of heads enlarged at one end and reduced at the other, having apertures and recesses therein, and crossbars, as set forth, the grips loosely and removably mounted in said heads, and having enlarged outer ends and inner concave downwardly projecting ends, with a smooth-bored aperture passing there through, and the threaded rod or bolt passing through said head and nuts, substantially as described."

The claim for the patent issued to *Tecktonius* is:

"Having thus described my invention, what I claim as new, and desire to secure by letters patent, is: The combi-

nation with a band of a pair of hollow, tapered metallic castings, having flat base plates, adapted to receive the ends of the said band, *tapered longitudinally perforated clamping wedges*, whose upper portions coincide in shape with the under surface of the tapered under wall of said castings, and having tapered undersides formed with series of transverse corrugations, and a coupling bolt passing through and connecting the said clamping wedges, and provided with suitable tightening nuts."

To my mind it is very clear that the evidence sustains the findings of the trial court to the effect that *Scott* violated his contract with *Tecktonius*, and in December, 1899, and since, wrongfully manufactured and sold the device described in and covered by the patent so issued to *Tecktonius*, and hence should be held liable in this action.

Dodge, J. I concur in the foregoing dissenting opinion of the chief justice.