SENN v. TILE LAYERS PROTECTIVE UNION ET AL.

No. 658. Argued March 31, April 1, 1937.—Decided May 24, 1937.

---

[10] Compare *Citizens' Telephone Co.* v. *Fuller*, 229 U. S. 322.

*Mr. Leon B. Lamfrom* for appellant.

470

*Mr. Joseph A. Padway* for appellees.

By leave of Court, *Messrs. Francis Biddle, Osmond K. Fraenkel, Lloyd K. Garrison, Nathan Greene,* and *V. Henry Rothschild, 2nd,* filed a brief on behalf of the American Civil Liberties Union and the International Juridical Assn., as *amici curiae,* urging affirmance of the judgment below.

Mr. Justice Brandeis delivered the opinion of the Court.

This case presents the question whether the provisions of the Wisconsin Labor Code which authorize giving publicity to labor disputes, declare peaceful picketing and patrolling lawful and prohibit granting of an injunction against such conduct, violate, as here construed and applied, the due process clause or equal protection clause of the Fourteenth Amendment.

The Labor Code occupies §§ 103.51 to 103.63 of the Wisconsin Statutes, 1935 (Wis. Laws, 1931, c. 376; Laws, 1935, c. 551, § 5). But only the following provisions of § 103.53 are directly involved on this appeal:

"(1) The following acts, whether performed singly or in concert, shall be legal:

.  .  .  .  .

"(e) Giving publicity to and obtaining or communicating information regarding the existence of, or the facts involved in, any dispute, whether by advertising, speaking, patrolling any public street or place where any person or persons may lawfully be, without intimidation or coercion, or by any other method not involving fraud, violence, breach of the peace, or threat thereof."

.  .  .  .  .

"(l) Peaceful picketing or patrolling, whether engaged in singly or in numbers, shall be legal.[1]

"(2) No court, nor any judge or judges thereof, shall have jurisdiction to issue any restraining order or temporary or permanent injunction which, in specific or general terms, prohibits any person or persons from doing, whether singly or in concert, any of the foregoing acts."

---

[1] Subsections (h), (i) and (k) are likewise relevant to the present issue, as supplementing subsections (e) and (l), but do not require special discussion.

On December 28, 1935, Senn brought this suit in the Circuit Court of Milwaukee County, against Tile Layers Protective Union, Local No. 5, Tile Layers Helpers Union, Local No. 47, and their business agents, seeking an injunction to restrain picketing, and particularly "publishing, stating or proclaiming that the plaintiff is unfair to organized labor or to the defendant unions"; and also to restrain some other acts which have since been discontinued, and are not now material. The defendants answered; and the case was heard upon extensive evidence. The trial court found the following facts.

The journeymen tile layers at Milwaukee were, to a large extent, members of Tile Layers Protective Union, Local No. 5, and the helpers, members of Tile Layers Helpers Union, Local No. 47. Senn was engaged at Milwaukee in the tile contracting business under the name of "Paul Senn & Co., Tile Contracting." His business was a small one, conducted, in the main, from his residence, with a showroom elsewhere. He employed one or two journeymen tile layers and one or two helpers, depending upon the amount of work he had contracted to do at the time. But, working with his own hands with tools of the trade, he performed personally on the jobs much work of a character commonly done by a tile layer or a helper. Neither Senn, nor any of his employees, was at the time this suit was begun a member of either union, and neither had any contractual relations with them. Indeed, Senn could not become a member of the tile layers union, since its constitution and rules require, among other things, that a journeyman tile setter shall have acquired his practical experience through an apprenticeship of not less than three years, and Senn had not served such an apprenticeship.

For some years the tile laying industry had been in a demoralized state because of lack of building operations; and members of the union had been in competition with

non-union tile layers and helpers in their effort to secure work. The tile contractors by whom members of the unions were employed had entered into collective bargaining agreements with the unions governing wages, hours and working conditions. The wages paid by the union contractors had for some time been higher than those paid by Senn to his employees.

Because of the peculiar composition of the industry, which consists of employers with small numbers of employees, the unions had found it necessary for the protection of the individual rights of their members in the prosecution of their trade to require all employers agreeing to conduct a union shop to assent to the following provision:

"Article III. It is definitely understood that no individual, member of a partnership or corporation engaged in the Tile Contracting Business shall work with the tools or act as Helper but that the installation of all materials claimed by the party of the second part as listed under the caption 'Classification of Work' in this agreement, shall be done by journeymen members of Tile Layers Protective Union Local #5."

The unions endeavored to induce Senn to become a union contractor; and requested him to execute an agreement in form substantially identical with that entered into by the Milwaukee contractors who employ union men. Senn expressed a willingness to execute the agreement provided Article III was eliminated. The union declared that this was impossible; that the inclusion of the provision was essential to the unions' interest in maintaining wage standards and spreading work among their members; and, moreover, that to eliminate Article III from the contract with Senn would discriminate against existing union contractors, all of whom had signed agreements containing the Article. As the unions declared its elimination impossible, Senn refused to sign

the agreement and unionize his shop. Because of his refusal, the unions picketed his place of business. The picketing was peaceful, without violence, and without any unlawful act. The evidence was that the pickets carried one banner with the inscription "P. Senn Tile Company is unfair to the Tile Layers Protective Union," another with the inscription "Let the Union tile layer install your tile work." [2]

The trial court denied the injunction and dismissed the bill. On the findings made, it ruled that the controversy was "a labor dispute" within the meaning of § 103.62; that the picketing, done solely in furtherance of the dispute, was "lawful" under § 103.53; that it was not unlawful for the defendants

"to advise, notify or persuade, without fraud, violence or threat thereof, any person or persons, of the existence of said labor dispute; . . .

"That the agreement submitted by the defendants to the plaintiff, setting forth terms and conditions prevailing in that portion of the industry which is unionized, is

---

[2] The complaint as to certain action of defendants other than the picketing was disposed of by defendants' agreement to discontinue the same, and is not now in question. It had been shown that, with a view to picketing Senn's jobs, the unions had caused his automobile to be followed from his place of business to the jobs where he and his men were working. It had also been shown that, some months earlier, the unions had sent letters to local architects and contractors requesting them not to patronize Senn because he was conducting a non-union shop and threatening to picket them if they did so; but that there had been no picketing of any architect or contractor and no such steps had been taken by the unions. Through counsel, the unions agreed: (1) that thereafter they would not pursue plaintiff's automobile from his residence to his jobs; and (2) that they would refrain from sending any further letters to architects or contractors, and would not indulge in any acts or conduct referred to in the letters theretofore sent. The court treated this agreement by counsel as disposing of the claim for relief on this ground.

sought by the defendants for the purpose of promoting their welfare and enhancing their own interests in their trade and craft as workers in the industry.

"That Article III of said agreement is a reasonable and lawful rule adopted by the defendants out of the necessities of employment within the industry and for the protection of themselves as workers and craftsmen in the industry."

Senn appealed to the Supreme Court of the State, which affirmed the judgment of the trial court and denied a motion for rehearing, two judges dissenting. (222 Wis. 383, 400; 268 N. W. 270, 872.) The case is here on appeal.

*First.* The defendants moved to dismiss the appeal for want of jurisdiction. They contend that the federal question presented is not substantial. And friends of the court suggest that the appeal should be dismissed because the decision below was based upon non-federal grounds, or that there was an alternative, independent non-federal ground broad enough to sustain the judgment; that the challenge here is not to a statute, but to a judicial decision based upon principles of general law which have been approved by some judges and disapproved by others; [3] and that there is nothing to show that the provisions of the Wisconsin Labor Code here questioned are not merely declaratory of the common law of Wisconsin as it existed prior to the statute. But it sufficiently appears that the provisions of the Labor Code were relied upon; that their validity under the Fourteenth Amendment was duly challenged below; and that the rulings by the state courts were based ultimately on the Labor Code.

---

[3] Compare *Zaat* v. *Building Trades Council,* 172 Wash. 445; 20 P. (2d) 589; *Roraback* v. *Motion Picture Operators Union,* 140 Minn. 481; 168 N. W. 766; *Hughes* v. *Motion Picture Operators Union,* 282 Mo. 304; 221 S. W. 95; *Fink* v. *Schwartz,* 28 Ohio (N. P.) 407. See *Thompson* v. *Boekhout,* 249 App. Div. 77; 291 N. Y. Supp. 572.

Whether the statute as construed and applied violates the Fourteenth Amendment presents issues never expressly passed upon by this Court. We deny the motion to dismiss.

*Second.* The hearings below were concerned mainly with questions of state law. Senn insisted there that the statute was no defense, because the controversy was not a "labor dispute" within the meaning of § 103.62.[4] The courts ruled that the controversy was a "labor dispute"; and that the acts done by the defendant were among those declared "lawful" by § 103.53. See also *American Furniture Co.* v. *Chauffeurs, Teamsters & Helpers Union,* 228 Wis. 338; 268 N. W. 250. Those issues involved the construction and application of the statute and the Constitution of the State. As to them the judgment of its highest court is conclusive. The question for our decision is whether the statute, as applied to the facts found, took Senn's liberty or property or denied him equal protection of the laws in violation of the Fourteenth Amendment. Senn does not claim broadly that the Federal Constitution prohibits a State from authorizing publicity and peaceful picketing. His claim of invalidity is rested on the fact that he refused to unionize his shop solely because the union insisted upon the retention of Article III. He contends that the right to work in his business with his own hands is a right guaranteed by the Fourteenth Amendment and that the State may not authorize unions

---

[4] That section provides:

"The term 'labor dispute' includes any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, or concerning employment relations, or any other controversy arising out of the respective interests of employer and employe, regardless of whether or not the disputants stand in the proximate relation of employer and employe."

to employ publicity and picketing to induce him to refrain from exercising it.

The unions concede that Senn, so long as he conducts a nonunion shop, has the right to work with his hands and tools. He may do so, as freely as he may work his employees longer hours and at lower wages than the union rules permit. He may bid for contracts at a low figure based upon low wages and long hours. But the unions contend that, since Senn's exercise of the right to do so is harmful to the interests of their members, they may seek by legal means to induce him to agree to unionize his shop and to refrain from exercising his right to work with his own hands. The judgment of the highest court of the state establishes that both the means employed and the end sought by the unions are legal under its law. The question for our determination is whether either the means or the end sought is forbidden by the Federal Constitution.

*Third.* Clearly the means which the statute authorizes—picketing and publicity—are not prohibited by the Fourteenth Amendment. Members of a union might, without special statutory authorization by a State, make known the facts of a labor dispute, for freedom of speech is guaranteed by the Federal Constitution. The State may, in the exercise of its police power, regulate the methods and means of publicity as well as the use of public streets. If the end sought by the unions is not forbidden by the Federal Constitution the State may authorize working men to seek to attain it by combining as pickets, just as it permits capitalists and employers to combine in other ways to attain their desired economic ends. The Legislature of Wisconsin has declared that "peaceful picketing and patrolling" on the public streets and places shall be permissible "whether engaged in singly or in numbers" provided this is done "without intimidation or coercion" and free from "fraud, violence,

breach of the peace or threat thereof." The statute provides that the picketing must be peaceful; and that term as used implies not only absence of violence but absence of any unlawful act. It precludes the intimidation of customers. It precludes any form of physical obstruction or interference with the plaintiff's business. It authorizes giving publicity to the existence of the dispute "whether by advertising, patrolling any public streets or places where any person or persons may lawfully be"; but precludes misrepresentation of the facts of the controversy. And it declares that "nothing herein shall be construed · to legalize a secondary boycott." See *Duplex Printing Co.* v. *Deering,* 254 U. S. 443, 466. Inherently, the means authorized are clearly unobjectionable. In declaring such picketing permissible Wisconsin has put this means of publicity on a par with advertisements in the press.

The state courts found that the unions observed the limitations prescribed by the statute. The conduct complained of is patrol with banners by two or four pickets. Compare *American Steel Foundries* v. *Tri-City Central Trades Council,* 257 U. S. 184, 207. The picketing was peaceful. The publicity did not involve a misrepresentation of fact; nor was any claim made below that relevant facts were suppressed. Senn did not contend that it was untruthful to characterize him as "unfair," if the requirement that he refrain from working with his own hands was a lawful one. He did not ask that the banners be required to carry a fuller statement of the facts. Compare *American Furniture Co.* v. *Chauffeurs, Teamsters & Helpers Union,* 222 Wis. 338, 340, 347; 268 N. W. 250, 251, 255. Moreover, it was confessedly open to Senn to disclose the facts in such manner and in such detail as he deemed desirable, and on the strength of the facts to seek the patronage of the public.

*Truax* v. *Corrigan,* 257 U. S. 312, is not applicable. The statute there in question was deemed to have been

applied to legalize conduct which was not simply peaceful picketing, not "lawful persuasion or inducing," not "a mere appeal to the sympathetic aid of would-be customers by a simple statement of the fact of the strike and a request to withhold patronage." It consisted of libelous attacks and abusive epithets against the employer and his friends; libelous and disparaging statements against the plaintiff's business; threats and intimidation directed against customers and employees. The means employed, in other words, were deemed to constitute "an admitted tort," conduct unlawful prior to the statute challenged. See pp. 327–8, 337, 346. In the present case the only means authorized by the statute and in fact resorted to by the unions have been peaceful and accompanied by no unlawful act. It follows, that if the end sought is constitutional—if the unions may constitutionally induce Senn to agree to refrain from exercising the right to work in his business with his own hands, their acts were lawful.

*Fourth.* The end sought by the unions is not unconstitutional. Article III, which the unions seek to have Senn accept, was found by the state courts to be not arbitrary or capricious, but a reasonable rule "adopted by the defendants out of the necessities of employment within the industry and for the protection of themselves as workers and craftsmen in the industry." That finding is amply supported by the evidence. There is no basis for a suggestion that the unions' request that Senn refrain from working with his own hands, or their employment of picketing and publicity, was malicious; or that there was a desire to injure Senn. The sole purpose of the picketing was to acquaint the public with the facts and, by gaining its support, to induce Senn to unionize his shop. There was no effort to induce Senn to do an unlawful thing. There was no violence, no force was applied, no molestation or interference, no coercion. There

was only the persuasion incident to publicity. As the Supreme Court of Wisconsin said:

"Each of the contestants is desirous of the advantage of doing business in the community where he or they operate. He is not obligated to yield to the persuasion exercised upon him by respondents. . . . The respondents do not question that it is appellants' right to own his own business and earn his living in any lawful manner which he chooses to adopt. What they are doing is asserting their rights under the acts of the Legislature for the purpose of enhancing their opportunity to acquire work for themselves and those whom they represent. . . . The respondents' act of peaceful picketing is a lawful form of appeal to the public to turn its patronage from appellant to the concerns in which the welfare of the members of the unions is bound up."

The unions acted, and had the right to act as they did, to protect the interests of their members against the harmful effect upon them of Senn's action. Compare *American Steel Foundries* v. *Tri-City Central Trades Council, supra,* 208, 209. Because his action was harmful, the fact that none of Senn's employees was a union member, or sought the union's aid, is immaterial.

The laws of Wisconsin, as declared by its highest court, permits unions to endeavor to induce an employer, when unionizing his shop, to agree to refrain from working in his business with his own hands—so to endeavor although none of his employees is a member of a union. Whether it was wise for the State to permit the unions to do so is a question of its public policy—not our concern. The Fourteenth Amendment does not prohibit it.

*Fifth.* There is nothing in the Federal Constitution which forbids unions from competing with non-union concerns for customers by means of picketing as freely as one merchant competes with another by means of advertisements in the press, by circulars, or by his win-

dow display. Each member of the unions, as well as Senn, has the right to strive to earn his living. Senn seeks to do so through exercise of his individual skill and planning. The union members seek to do so through combination. Earning a living is dependent upon securing work; and securing work is dependent upon public favor. To win the patronage of the public each may strive by legal means. Exercising its police power, Wisconsin has declared that in a labor dispute peaceful picketing and truthful publicity are means legal for unions. It is true that disclosure of the facts of the labor dispute may be annoying to Senn even if the method and means employed in giving the publicity are inherently unobjectionable. But such annoyance, like that often suffered from publicity in other connections, is not an invasion of the liberty guaranteed by the Constitution. Compare *Pennsylvania Railroad Co.* v. *United States Railroad Labor Board*, 261 U. S. 72.[5] It is true, also, that disclosure of the facts may prevent Senn from securing jobs which he hoped to get. But a hoped-for job is not property guaranteed by the Constitution. And the diversion of it to a competitor is not an invasion of a constitutional right.

*Sixth.* It is contended that in prohibiting an injunction the statute denied to Senn equal protection of the laws, and *Truax* v. *Corrigan, supra,* is invoked. But the issue suggested by plaintiff does not arise. For we hold that the provisions of the Wisconsin statute which authorized the conduct of the unions are constitutional.

---

[5] The State has, of course, power to afford protection to interests of personality, such as "the right of privacy." The protection by decision or statute of such interests of personality, rests on other considerations than are here involved. See Moreland, *The Right of Privacy Today* (1931) 19 Ky. L. J. 101; Lisle, *The Right of Privacy,* id., 137; Green, *The Right of Privacy* (1932) 27 Ill. L. Rev. 237, 238.

One has no constitutional right to a "remedy" against the lawful conduct of another.

*Affirmed.*

Mr. Justice Butler, dissenting.

Plaintiff is a tile layer and has long been accustomed to work as a helper and mechanic in that trade. The question presented is whether, consistently with the due process and equal protection clauses of the Fourteenth Amendment, the State may by statute authorize or make it lawful for labor unions to adopt and carry into effect measures intended and calculated to prevent him from obtaining or doing that work. The decision just announced answers that question in the affirmative. The facts are not in controversy. Let them disclose the concrete application of the legislation now held valid.

Plaintiff lives and works in Milwaukee. Since the latter part of 1931 he has been engaged in performing small tile laying jobs. He has personally performed almost half the manual labor required. He usually employs a tile setter and helper; occasionally he has more than one of each. He has never been a member of the tile layers union. Though a competent mechanic in that trade, he is excluded from membership because he takes contracts and because he has not served the apprenticeship required by union rules. In 1935 he had about 40 jobs. His net income was $1,500 of which $750 was attributed to his own labor. The balance, constituting his profit as contractor, was not enough to support him and family.

Defendant Local No. 5 is composed of tile layers. Its membership, 112 in 1929, had fallen to 41 at the time of the trial in January, 1936. Early in 1935 it proffered to all local contractors including plaintiff a contract fixing wages, hours and the like. About half of them signed; the others did not. It contained the following: "It is definitely understood that no individual, member of a

partnership or corporation engaged in the Tile Contracting Business shall work with the tools or act as Helper, but that the installation of all materials claimed by the party of the second part [Local No. 5] as listed under the caption 'Classification of Work' in this agreement, shall be done by journeymen members of Tile Layers Protective Union Local #5." Because of that provision plaintiff declined to sign. But repeatedly he declared to representatives of the union that he was willing to employ its members and to comply with its rules as to wages, hours and working conditions; he assured them that, when his business was sufficient to permit, he would refrain from manual labor, and explained that without personally working he could not now continue in business. Conceding the truth of that statement, the union nevertheless persistently declined to modify its demands.

The president of Local No. 5 testified that, if plaintiff did not sign the contract, it would do everything "to harass and put things in his way"; that it intended to announce to the world that he is a non-union contractor and on that account should not be patronized, to picket his place of business, to ascertain where he had jobs and to picket them and in that way bring pressure to bear upon him to become a union contractor, to put him in the category of a non-union contractor unless he agrees to lay aside the tools of the trade. The program so declared corresponds with what the unions had already done against him.

In July, 1935, Local No. 5 sent to all contractors and architects letters stating: "Some time ago we presented to each individual tile contractor in the city a copy of our new agreement [this refers to the one plaintiff was called on to sign] in which we specified what constitutes a bona fide contractor and who should install the work. Not having heard from some of these so called tile contractors in a given time, we beg of you to contact the

list of fair contractors listed below in awarding the tile work in your building operations. If in two weeks time anyone outside this list is awarded tile work we will then picket such jobs, contractors' or architects' offices, or employ other lawful means to help us in our fight to better the conditions of our trade." Plaintiff's name was not on the list approved by the union. Therefore the letter meant that, in order to prevent him from working, the union would apply the described pressure to him, his work, the jobs of which his tile laying was a part, the contractors and the architects from whom he got work.

Commencing December 6, 1935, it put in front of his house two men carrying signs, one being: "P. Senn Tile Company [meaning the plaintiff] is unfair to the Tile Layers Protective Union," and the other: "Let the Union tile layers install your tile work." And regularly from eight in the morning until noon and from one to four in the afternoon it carried on picketing of that sort, sometimes using four men. They refrained from speaking to plaintiff or others and committed no breach of the peace. In that sense they carried on "peaceful picketing." The union sent men in automobiles to follow plaintiff when going from his home to his work, and instructed all its members to discover where he had jobs in order to picket them.

To justify the elimination of plaintiff, counsel told the court that "because of the demoralized condition of the trade, the union decides it does not want a contractor, whether he be skilled in the trade or unskilled, to work with the tools of the trade with the men because there is not enough work to go around." And on the witness stand the president of Local No. 5 expressed the idea that, if the contractors did not work, members of the union would be taken off relief.

The trial court found the picketing peaceful and lawful; it did not pass on other acts constituting pressure

put on plaintiff. But the unions themselves deemed unlawful much that they had threatened and done to coerce him. The findings say that "the defendants, by their counsel, have stated in open court that they will not pursue the automobile of the plaintiff from his place of business to his jobs; that they will refrain from sending any further letters to architects or contractors, and will not indulge in any acts or conduct referred to in said letters towards said contractors and architects." The trial court held plaintiff not entitled to relief. The supreme court affirmed. 222 Wis. 383; 268 N. W. 270. Following its decision in *American Furniture Co.* v. *Chauffeurs, Teamsters & Helpers Union,* 222 Wis. 338; 268 N. W. 250, construing § 103.62, it held that within the meaning of that section a "labor dispute" existed between plaintiff and defendants and that under § 103.53 the picketing was legal.

The clauses of the Fourteenth Amendment invoked by plaintiff are: "No State shall . . . deprive any person of life, liberty, or property without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." Our decisions have made it everywhere known that these provisions forbid state action which would take from the individual the right to engage in common occupations of life, and that they assure equality of opportunity to all under like circumstances. Lest the importance or wisdom of these great declarations be forgotten or neglected, there should be frequent recurrence to decisions of this court that expound and apply them.

"While this Court has not attempted to define with exactness the liberty thus guaranteed, the term has received much consideration and some of the included things have been definitely stated. Without doubt, it denotes not merely freedom from bodily restraint but also the right of the individual to contract, to engage

in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized at common law as essential to the orderly pursuit of happiness by free men." *Meyer* v. *Nebraska,* 262 U. S. 390, 399.

"The right to follow any of the common occupations of life is an inalienable right. It was formulated as such under the phrase 'pursuit of happiness' in the Declaration of Independence, which commenced with the fundamental proposition that 'all men are created equal, that they are endowed by their Creator with certain inalienable rights; that among these are life, liberty and the pursuit of happiness.' . . . I hold that the liberty of pursuit—the right to follow any of the ordinary callings of life—is one of the privileges of a citizen of the United States." Concurring opinion of Mr. Justice Bradley in *Butchers' Union Co.* v. *Crescent City Co.,* 111 U. S. 746, 762, approvingly quoted in *Allgeyer* v. *Louisiana,* 165 U. S. 578, 589.

"Included in the right of personal liberty and the right of private property—partaking of the nature of each—is the right to make contracts for the acquisition of property. Chief among such contracts is that of personal employment by which labor and other services are exchanged for money or other forms of property. If this right be struck down or arbitrarily interfered with, there is a substantial impairment of liberty in the long-established constitutional sense. The right is as essential to the laborer as to the capitalist, to the poor as to the rich; for the vast majority of persons have no other honest way to begin to acquire property, save by working for money." *Coppage* v. *Kansas,* 236 U. S. 1, 14.

"It requires no argument to show that the right to work for a living in the common occupations of the com-

munity is of the very essence of the personal freedom and opportunity that it was the purpose of the amendments to secure." *Truax* v. *Raich,* 239 U. S. 33, 41.

"Under that amendment, nothing is more clearly settled than that it is beyond the power of a state, 'under the guise of protecting the public, arbitrarily [to] interfere with private business or prohibit lawful occupations or impose unreasonable and unnecessary restrictions upon them.'" *New State Ice Co.* v. *Liebmann,* 285 U. S. 262, 278.

"The Fourteenth Amendment . . . undoubtedly intended not only that there should be no arbitrary deprivation of life or liberty, or arbitrary spoliation of property, but that equal protection and security should be given to all under like circumstances in the enjoyment of their personal and civil rights; that all persons should be equally entitled to pursue their happiness and acquire and enjoy property; that they should have like access to the courts of the country for the protection of their persons and property, the prevention and redress of wrongs, and the enforcement of contracts; that no impediment should be interposed to the pursuits of any one except as applied to the same pursuits by others under like circumstances; that no greater burdens should be laid upon one than are laid upon others in the same calling and condition. . . ." *Barbier* v. *Connolly,* 113 U. S. 27, 31.

"For, the very idea that one man may be compelled to hold his life, or the means of living, or any material right essential to the enjoyment of life, at the mere will of another, seems to be intolerable in any country where freedom prevails, as being the essence of slavery itself." *Yick Wo* v. *Hopkins,* 118 U. S. 356, 370.

The legislative power of the State can only be exerted in subordination to the fundamental principles of right and justice which the guaranties of the due process and

equal protection clauses of the Fourteenth Amendment are intended to preserve. Arbitrary or capricious exercise of that power whereby a wrongful and highly injurious invasion of rights of liberty and property is sanctioned, stripping one of all remedy, is wholly at variance with those principles. *Truax* v. *Corrigan,* 257 U. S. 312, 327.

It may be assumed that the picketing, upheld in virtue of the challenged statute, lawfully might be employed in a controversy between employer and employees for the purpose of persuading the employer to increase pay, etc., and dissuading non-union workers from displacing union members. The right of workers, parties to a labor dispute, to strike and picket peacefully to better their condition does not infringe any right of the employer. *American Foundries* v. *Tri-City Council,* 257 U. S. 184, 209. *United Mine Workers* v. *Coronado Coal Co.,* 259 U. S. 344, 386. *Wolff Co.* v. *Industrial Court,* 262 U. S. 522, 540, 541. *Dorchy* v. *Kansas,* 264 U. S. 286, 289. But strikes or peaceful picketing for unlawful purposes are beyond any lawful sanction. The object being unlawful, the means and end are alike condemned. *Dorchy* v. *Kansas,* 272 U. S. 306, 311. *Toledo, A. A. & N. M. Ry. Co.* v. *Pennsylvania Co.,* 54 Fed. 730, 737–739. And see *Truax* v. *Corrigan, supra,* 327; *Exchange Bakery & Restaurant* v. *Rifkin,* 245 N. Y. 260, 262–263; 157 N. E. 130.

The object that defendants seek to attain is an unlawful one.

Admittedly, it is to compel plaintiff to quit work as helper or tile layer. Their purpose is not to establish on his jobs better wages, hours, or conditions. If permitted, plaintiff would employ union men and adhere to union requirements as to pay and hours. But, solely because he works, the unions refuse to allow him to unionize and carry on his business. By picketing, the unions would

prevent him working on jobs he obtained from others and so destroy that business. Then, by enforcement of their rules they would prevent him from working as a journeyman for employers approved by the union or upon any job employing union men. Adhering to the thought that there is not enough work to go around, unquestionably the union purpose is to eliminate him from all tile laying work. And highly confirmatory of that purpose is the failure of the contract proposed by the union to permit plaintiff personally to do work in the performance of jobs undertaken by him for prices based upon union rates of pay for all labor, including his own.

The principles governing competition between rival individuals seeking contracts or opportunity to work as journeymen cannot reasonably be applied in this case. Neither the union nor its members take tile laying contracts. Their interests are confined to employment of helpers and layers, their wages, hours of service, etc. The contest is not between unionized and other contractors or between one employer and another. The immediate issue is between the unions and plaintiff in respect of his right to work in the performance of his own jobs. If as to that they shall succeed, then will come the enforcement of their rules which make him ineligible to work as a journeyman. It cannot be said that, if he should be prevented from laboring as helper or layer, the work for union men to do would be increased. The unions exclude their members from jobs taken by non-union employers. About half the tile contractors are not unionized. More than 60 percent of the tile layers are non-union men. The value of plaintiff's labor as helper and tile layer is very small—about $750 per year. Between union members and plaintiff there is no immediate or direct competition. If under existing circumstances there ever can be any, it must come about through a chain of unpredictable events making

its occurrence a mere matter of speculation. The interest of the unions in the manual labor done by plaintiff is so remote, indirect and minute that they have no standing as competitors. *Berry* v. *Donovan,* 188 Mass. 353, 358; 74 N. E. 603. Under the circumstances here disclosed, the conduct of the unions was arbitrary and oppressive. *Roraback* v. *Motion Picture Operators Union,* 140 Minn. 481, 486; 168 N. W. 766. *Hughes* v. *Motion Picture Operators Union,* 282 Mo. 304; 221 S. W. 95.

Moreover, the picketing was unlawful because the signs used constitute a misrepresentation of the facts. One of them declared plaintiff "unfair" to the tile layers union and, upon the basis of that statement, the other sign solicited tile work for union tile layers. There was given neither definition of the word nor any fact on which the accusation was based. By the charge made, there was implied something unjust or inequitable in his attitude toward labor unions. But there was no foundation of fact for any such accusation. There was no warrant for characterizing him as "unfair" or opposed to any legitimate purpose of the tile layers union or as unjust to union men. There is no escape from the conclusion that the unions intended by the picketing they carried on to misrepresent plaintiff in respect of his relation to, or dealing with, the tile layers union and by that means to deprive him of his occupation. The burden may not justly be held to be on him, by counter-picketing or otherwise, to refute or explain the baseless charge.

The judgment of the state court, here affirmed, violates a principle of fundamental law: That no man may be compelled to hold his life or the means of living at the mere will of others. *Yick Wo* v. *Hopkins, ubi supra.* The state statute, construed to make lawful the employment of the means here shown to deprive plaintiff of his right to work or to make lawful the picketing carried on in this case, is repugnant to the due process and equal protection

clauses of the Fourteenth Amendment. *Truax* v. *Corrigan, supra,* 328.

I am of opinion that the judgment should be reversed.

MR. JUSTICE VAN DEVANTER, MR. JUSTICE McREYNOLDS, and MR. JUSTICE SUTHERLAND join in this dissent.